IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31499-5-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ADRIENNA M. MOSIER, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Adrienna Mosier appeals her convictions for second degree burglary and second degree theft. She contends that the State failed to produce sufficient evidence to support the convictions. We agree that the State failed to prove second degree burglary. We, therefore, reverse that conviction but affirm her conviction for second degree theft.

## FACTS

Asotin County charged Ms. Mosier with second degree burglary and second degree theft after her employer reported that the daily receipt money bag was missing from the office lockbox. The following facts were presented at trial.

On July 5, 2012, office manager Karen Bolen arrived to open the Riverview Animal Clinic in Clarkston, Washington. Ms. Bolen discovered that the daily receipts bag containing checks and roughly $1,500 in cash was missing. The money bag was last seen when employee Tara Cunningham secured it into a lockbox two days earlier, prior to the close of business for the July 4 holiday. There was no evidence of a break in at the clinic or forced entry into the lockbox. The office manager also noticed her desk drawers had been rifled through and an office chair out of place.

The lockbox was kept in the back feed room of the clinic, and the key to the lockbox was kept in a prescription bottle in a refrigerator in the animal isolation room. Each of the 13 or 14 employees of the clinic had a key to the building, and every employee knew the key to the lockbox was kept in the refrigerator. The lockbox and key were found in their designated places when employees discovered the theft.

Asotin County Sheriff's Detective Jackie Nichols investigated the theft. According to Detective Nichols, clinic employees thought the burglary and theft were committed by an employee or someone with inside knowledge. Most of the people Detective Nichols interviewed suspected Ms. Mosier, Ms. Mosier's boyfriend Brent Glass, or both. Several members of the clinic staff testified to these same suspicions.

Dr. William Meyers and two kennel workers told Detective Nichols that they were in the clinic the morning of July 4 to care for animals. Employee Amanda Clark told Detective Nichols that she was at the clinic in the late afternoon to pick up some suture scissors. She told Detective Nichols that when she arrived, she noticed that the lights were on in room where the lockbox was kept and a protective fence in the clinic was knocked over. Ms. Clark turned off the lights before she left.

Ms. Mosier told Detective Nichols that she was at the clinic around 9:30 p.m. to pick up empty boxes because she and her boyfriend, Mr. Glass, were planning a move to his mother's house in Pullman. She drove her white Pontiac to the clinic while Mr. Glass stayed at home. Ms. Mosier said that she entered through the back door, got the key to the storage shed where the boxes are kept, opened the shed, put the key back, and took the boxes when she left. After leaving the clinic, she picked up her children from the local fireworks show and went home to pack. She told Detective Nichols that she and her car remained at home for the rest of the night. She also said that Mr. Glass did not take her car. Detective Nichols testified that when Ms. Mosier talked about being at the clinic on the night of the burglary, she became nervous, shaky, and her voice changed.

Carrollene Klein, clinic employee and friend of Ms. Mosier, testified that Ms. Mosier called her at about 4:00 a.m. on July 5. Ms. Mosier was crying and told Ms. Klein that Mr. Glass left in their car. She asked Ms. Klein for a ride to work that day if he did not return on time. Ms. Klein received a second call from Ms. Mosier during lunch. Ms. Mosier asked to borrow Ms. Klein's truck so she could move to Pullman. Ms. Mosier did not mention the burglary or theft to Ms. Klein during that latter conversation, which Ms. Klein thought was odd. Ms. Klein learned about the theft from another coworker who called around the same time as Ms. Mosier.

Dr. Kathy Ponozzo testified that on the morning of July 5 that Ms. Mosier arrived to work late. When Dr. Ponozzo asked Ms. Mosier if she knew anything about the missing money, Ms. Mosier said that she did not know anything, but that she was in the clinic the night before getting boxes. Dr. Ponozzo thought Ms. Mosier's eyes were red, as if she were upset or crying. Ms. Bolen also thought Ms. Mosier was not her usual self, instead being quiet and withdrawn.

Ms. Mosier was familiar with the money bag, the lockbox, and the location of the key. For instance, once she hid gas gift cards that she had won at the casino so Mr. Glass would not use or sell them. She said that she never opened the lockbox in Mr. Glass's presence and he would not have known where it was.

4

Clinic employees testified that they did not know Ms. Mosier planned to move to Pullman. Amanda Clark considered herself a good friend of Ms. Mosier and did not find out that Ms. Mosier planned to move until an interview with Detective Nichols. She was surprised that Ms. Mosier did not tell anyone of the move. Dr. Ponozzo was also surprised to hear that Ms. Mosier was planning to move because it could require Ms. Mosier to leave her job. Finally, Ms. Klein heard Ms. Mosier talk before about maybe moving to Pullman, but did not know Ms. Mosier's immediate plans to move and thought the decision was spur of the moment and a bit surprising.

Clinic employee Kellee Whipple was responsible for collecting boxes at the clinic and taking them to the recycle center. If someone wanted boxes, the usual practice was to ask Ms. Whipple not to recycle the boxes. Ms. Whipple said that Ms. Mosier did not ask to save boxes or mention that she was planning on moving. Ms. Whipple did not notice whether any of the stored boxes were missing on July 5.

Despite Ms. Mosier's claim to be home all night, Detective Nichols discovered evidence showing otherwise. Detective Nichols found out that Ms. Mosier and Mr. Glass each had a Clearwater River Casino player's card, which tracked their usage. Ms. Mosier's card was used on July 4 from 3:39 p.m. to 6:09 p.m., and again for 25 minutes right after midnight. For the latter visit, surveillance video from the casino showed Ms.

5

Mosier and Mr. Glass arriving in the white Pontiac and gambling on various machines inside the casino. The gambling occurred during the time that Ms. Mosier said she was at home, in bed.

The State charged Ms. Mosier with second degree burglary and second degree theft. The trial court gave the jury accomplice liability instructions for both charges. The jury found Ms. Mosier guilty of the crimes charged. The court imposed 90 days of confinement.

Additionally, the court imposed $2,022.96 in restitution plus other discretionary and mandatory costs, for a total legal financial obligation (LFO) of $5,247.96. Ms. Mosier did not object to the LFOs, and there is no indication that she contested the amount of restitution. The trial court asked Ms. Mosier if she was confident that she could pay $50 or more per month beginning six months after release from jail. Although the record shows Ms. Mosier's answer was inaudible, the trial court's reply was consistent with an affirmative response. The court found that Ms. Mosier had the ability or likely future ability to pay the LFOs and ordered her to pay no less than $50 per month, beginning 60 days after release from incarceration.

Ms. Mosier appeals. She contends that the evidence is insufficient to support her convictions. She also challenges the imposition of LFOs.

ANALYSIS

A.      *Whether the State presented sufficient evidence to prove second degree burglary*

Ms. Mosier contends that the State failed to present sufficient evidence to prove

the crime of second degree burglary. When sufficiency of the evidence is challenged,

appellate courts review the record to determine whether the evidence is sufficient for a

reasonable person to find every element of the crime beyond a reasonable doubt. *State v.*

*Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). A claim of sufficiency of the evidence

admits the truth of the State's evidence and all inferences that reasonably can be drawn

therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Sufficient means more than a mere scintilla of evidence; there must be that

quantum of evidence necessary to establish circumstances from which the jury could

reasonably infer the fact to be proved. *State v. Fateley*, 18 Wn. App. 99, 102, 566 P.2d

959 (1977). Circumstantial evidence is considered as reliable as direct evidence. *State v.*

*Myers*, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997). A fact finder is permitted to draw

inferences from circumstantial evidence so long as the inferences are rationally related to

the proven fact. *State v. Bencivenga*, 137 Wn.2d 703, 707, 974 P.2d 832 (1999). A

reviewing court should reverse a conviction for insufficient evidence where no rational

trier of fact, when viewing the evidence in a light most favorable to the State, could have

7

found the elements of the crime charged beyond a reasonable doubt. *State v. Hundley,* 126 Wn.2d 418, 421-22, 895 P.2d 403 (1995).

A person is guilty of second degree burglary if, "with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building other than a vehicle or a dwelling." RCW 9A.52.030(1). A person enters or remains unlawfully "in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(5).

A defendant's invitation to enter a building can be expressly or impliedly limited as to place or time. *State v. Thomson,* 71 Wn. App. 634, 638, 861 P.2d 492 (1993). A defendant who exceeds either type of limit, with intent to commit a crime in the building, engages in conduct that constitutes burglarious and felonious. *Id.* If an employee has unrestricted and unlimited right of entrance, for example the use of a key to gain entry at any time, the employee cannot be guilty of the crime of burglary even though he or she carried goods away from the premises. *State v. Corcoran,* 82 Wash. 44, 50, 143 P. 453 (1914).

8

Here, there were no limitations on Ms. Mosier's ability to enter the building. There is no testimony that she would not have been allowed in the building after hours. She cannot be guilty of burglary of the clinic because there is no evidence of unlawful entry or remaining.

However, the State argues that its theory for the crime was that Ms. Mosier was guilty of burglary as an accomplice and not the principal. The State maintains that Mr. Glass, as the principal, entered the clinic with the specific intent to steal the money from the lockbox and Ms. Mosier, as the accomplice, aided his crime by providing entry to the clinic.

Under an accomplice liability theory, the State must prove the substantive crime was committed and the accused acted with knowledge that he or she was aiding in the commission of the offense. *See State v. Peterson*, 54 Wn. App. 75, 78-79, 772 P.2d 513 (1989). A person is guilty as an accomplice of another person in the commission of the crime if, with knowledge that it will promote or facilitate the crime he or she:

> (i) Solicits, commands, encourages, or requests such other person to commit [the crime]; or
> (ii) Aids or agrees to aid such other person in planning or committing [the crime].

RCW 9A.08.020(3)(a).

9

The evidence is not sufficient to support Ms. Mosier's conviction under an accomplice liability theory. For Ms. Mosier to be an accomplice, the State needed to show that the underlying crime was committed by Mr. Glass, i.e., that he entered or remained in the building unlawfully with the intent to commit a crime. However, the State did not present any direct or circumstantial evidence that Mr. Glass ever entered the building. The mere speculation of clinic employees that Mr. Glass committed the crime is not substantial evidence of proof. With no evidence that Mr. Glass entered the building, the State cannot establish that Ms. Mosier aided him in this endeavor. Ms. Mosier's conviction for second degree burglary therefore must be reversed.

B. *Whether the State presented sufficient evidence to prove second degree theft*

Next, Ms. Mosier contends that the State failed to present sufficient evidence to prove the crime of second degree theft. Second degree theft requires proof that the accused stole property, other than a firearm, or services worth more than $750. RCW 9A.56.040(1).

Presuming the truth of the State's evidence and all inferences that reasonably can be drawn therefrom, we find the evidence sufficient to support the conviction for second degree theft. The evidence did not show forced entry into the clinic or the lockbox. Ms. Mosier had a key to the clinic and admitted to being in the building during the period

10

when the theft occurred. She knew the location of the key and lockbox. When questioned about the incident, Ms. Mosier gave false statements. She said that she was home all night, but a surveillance video showed her gambling at the casino after going to the clinic. She also said her car was home all night, but also told a friend that Mr. Glass took her car at 4:00 the same morning.

Other statements and actions by Ms. Mosier were suspicious. She told Dr. Ponozzo and Detective Nichols that she came to the clinic the evening of July 4 to obtain boxes to move, but she told no one in the office of her immediate plans to move. Detective Nichols testified that Ms. Mosier appeared very nervous while he questioned her about the theft. Last, around noon on July 5, Ms. Mosier called her closest friend at the clinic yet failed to tell her about the missing money even though that was an event of serious concern.

The circumstantial evidence supports the State's theory that Ms. Mosier took the cash and checks from the clinic lockbox. A rational trier of fact, when viewing the evidence in the light most favorable to the State, could have found the elements of second degree theft beyond a reasonable doubt.

C.      *Whether the trial court erred when imposing the LFOs*

Ms. Mosier's remaining challenge on appeal is to the trial court's imposition of

LFOs. She contends that the trial court failed to take into account her present or future

ability to pay, as required by RCW 10.01.160.

In *State v. Duncan*, 180 Wn. App. 245, 253, 327 P.3d 699 (2014), *petition for*

*review filed*, No. 90188-1 (April 30, 2014), we observed that whether a defendant will be

unable to pay LFOs imposed at sentencing is not an issue that defendants overlook, it is

one they reasonably waive, and concluded that we would henceforth decline to address a

challenge to consider that issue if raised for the first time on appeal. RAP 2.5(a). Our

position is consistent with that of the other divisions of our court. *See State v. Blazina*,

174 Wn. App. 906, 911, 301 P.3d 492, *review granted*, 178 Wn.2d 1010, 311 P.3d 27

(2013) and *State v. Calvin*, 176 Wn. App. 1, 316 P.3d 496, 507-08, *petition for review*

*filed*, No. 89518-0 (Nov. 12, 2013).

Ms. Mosier did not object to the trial court's imposition of LFOs on the basis of

the court's failure to consider her ability to pay. Indeed, when asked by the court if she

could afford the court proposed payment, the record provides evidence that she answered

in the affirmative. She waived any challenge on appeal.

12

D.    *Statement of additional grounds for review*

In her statement of additional grounds for review, Ms. Mosier contends that her counsel was ineffective. Ms. Mosier claims that her attorney was distracted, failed to request a suppression hearing, did not discuss trial strategy, and was generally not prepared.

To establish ineffective assistance of counsel, a defendant must prove both, "(1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

Ms. Mosier's attorney provided effective representation. First, there is no evidence that Ms. Mosier's attorney was distracted. Ms. Mosier's attorney did note to the court that she was keeping her telephone available in case her daughter encountered bad weather while traveling, but there is no further evidence of telephone calls or other distractions.

13

Second, it is doubtful whether Ms. Mosier would have been successful in a suppression hearing. Ms. Mosier claims that her statements should have been suppressed because Detective Nichols' interview of her at the clinic was a custodial interrogation, and she was not advised of her *Miranda*[1] warnings. She argues that she was in custody because she was fingerprinted and questioned in a small room at the clinic. However, she was not deprived of her freedom to move nor did the detective have probable cause to arrest at the time of her interview. In light of these factors, it is highly doubtful that a suppression motion would have succeeded.

Third, the record does not show that Ms. Mosier's counsel was unprepared. In fact, during sentencing, the trial court responded to similar concerns of a supporter of Ms. Mosier. The court said, "I take exception to—on the record, I take exception to Ms. Beecroft dissing your lawyer. She tried an excellent case. And—I disagree with her wholeheartedly that . . . [you] got a bum steer. . . . [Your lawyer] tried a fantastic case." Report of Proceedings at 187-88. Ms. Mosier fails to establish ineffective assistance of counsel.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Last, Ms. Mosier contends that she was wrongfully arrested and jailed for the crime. We reject this argument, considering our conclusion that the evidence supports Ms. Mosier's conviction for second degree theft.

In conclusion, we reverse Ms. Mosier's conviction for second degree burglary, affirm her conviction for second degree theft, and affirm the imposition of LFOs.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Brown, J.

Siddoway, C.J.